### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | |
|---|---|
| *IN RE* TRI-STATE WATER RIGHTS LITIGATION | Case No. 3:07-MD-1-J-PAM-JRK |
| STATE OF GEORGIA, | |
| Plaintiff, | |
| v. | Case No. 3:07-CV-251-J-PAM-JRK |
| UNITED STATES ARMY CORPS OF ENGINEERS, et al., | |
| Defendants. | |

### SECOND AMENDED AND SUPPLEMENTED COMPLAINT IN *GEORGIA V. UNITED STATES ARMY CORPS OF ENGINEERS*, CIVIL ACTION FILE NO. 3:07-CV-251 (*GEORGIA II*)

Plaintiff, the State of Georgia ("Georgia"), brings this action under the Administrative Procedure Act for judicial review of the Interim Operations Plan for Jim Woodruff Lock and Dam ("JWLD"), which the United States Army Corps of Engineers ("the Corps") adopted and began to implement on March 7, 2006, together with the revisions announced on June 12, 2006, September 7, 2006, March 2, 2007, November 1, 2007, November 7, 2007, and June 1, 2008 (the "IOP"), and Defendants' failure to update the water control plan for the federal reservoirs in the Apalachicola-Chattahoochee-Flint ("ACF") River Basin.  Georgia filed its original complaint in *Georgia v. United States Army Corps of Engineers*, 3:07-CV-251 ("*Georgia II*") on June 20, 2006, Doc. No. 2 ("Georgia's Original *Georgia II* Complaint").  The State of Georgia amended its Original *Georgia II* Complaint on June 6, 2007, Doc. No. 33 ("Georgia's First Amended *Georgia II* Complaint").  In accordance with this Court's August 27, 2008 Amended Scheduling

Order, Georgia hereby amends and supplements its First Amended *Georgia II* Complaint by

filing this Second Amended and Supplemented Complaint:

## PARTIES

1.　　　Plaintiff, the State of Georgia, brings this action in its own capacity based upon

actual injury to its interests and in its representative capacity as *parens patriae* for the citizens of

the State of Georgia based upon irreparable harm to the general welfare of the State and its

citizens.  Georgia has suffered legal and irreparable harm because of the agency action described

in this Complaint.

2.　　　Defendant United States Army Corps of Engineers (the "Corps") is a branch of

the United States Army under the direction and supervision of the Secretary of the United States

Army and is an agency of the United States within the meaning of 5 U.S.C. § 701.

3.　　　Defendant Preston M. Geren ("Secretary Geren") is the Secretary of the United

States Army.  Defendant John P. Woodley, Jr. ("Assistant Secretary Woodley") is the Assistant

Secretary of the United States Army for Civil Works.  Defendant Lieutenant General Robert L.

Van Antwerp ("General Van Antwerp") is the Commander and Chief of Engineers, United States

Army Corps of Engineers.  Defendant Brigadier General Joseph Schroedel ("General

Schroedel") is the Division Commander for the South Atlantic Division of the United States

Army Corps of Engineers.  Defendant Colonel Byron Jorns ("Colonel Jorns") is the District

Commander for the Mobile District of the United States Army Corps of Engineers.

4.　　　Secretary Geren, Assistant Secretary Woodley, General Van Antwerp, General

Schroedel, and Colonel Jorns, or their predecessors, acting in their official capacities,

individually or collectively are responsible for and approved the acts and omissions of the Corps alleged herein and are responsible for compliance by the Corps with any decree of this Court.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to federal law, including 28 U.S.C.A. § 1331, 5 U.S.C.A. § 701 *et seq*., 28 U.S.C.A. § 2201 *et seq*., 43 U.S.C.A. § 390b, and the Constitution of the United States of America.

6.      Lake Lanier and the Chattahoochee River, two bodies of water at issue in this litigation, are physically located within the Atlanta Division of the Northern District of Georgia. Defendant General Schroedel resides within the Atlanta Division of the Northern District of Georgia, and a substantial part of the events and omissions giving rise to the claims asserted in this Complaint occurred in the Atlanta Division of the Northern District of Georgia.

7.      Venue in the Northern District of Georgia and the Atlanta Division is proper pursuant to 28 U.S.C.A. § 1391(e)(1) and (2) and Local Rule 3.1 of the Northern District of Georgia Court Rules.

## NATURE OF THE CLAIMS

8.      This Complaint seeks judicial review of the Corps' adoption of the IOP and the Corps' failure to update the water control plans for the federal reservoirs in the ACF Basin.  The IOP, issued in connection with the Corps' initiation of formal consultation with the U.S. Fish and Wildlife Service ("FWS") under Section 7 of the Endangered Species Act ("ESA") and subsequently modified, sets certain specific rules for the Corps' operation of the federal reservoirs in the ACF River Basin for the purpose of providing sufficient flows for three species of federally-protected freshwater mussels species (the fat threeridge mussel, the purple

bankclimber mussel, and the Chipola slabshell mussel) and for the Gulf sturgeon (collectively, "the ACF Species"). The IOP, which involves substantially higher releases from the federal reservoirs in the ACF River Basin than have occurred in the past, is invalid because it involves the release of substantially more water than is necessary or prudent, places the vital needs within the ACF River Basin, including the ACF Species, at risk, and was adopted without considering all relevant factors and without following the procedures prescribed for adoption of water control plans under applicable regulations. Therefore, the IOP is arbitrary and capricious; in excess of statutory jurisdiction, authority or limitations; and without observance of procedure required by law.

## FACTUAL AND LEGAL BACKGROUND

### Georgia's Statutory Responsibility for Water Resources

9. Georgia has exercised dominion and control over its water resources since its Statehood. Today, Georgia requires conservation of those resources and carefully regulates water use. For example, the Georgia Water Quality Control Act reads as follows:

> The people of the State of Georgia are dependent upon the rivers, streams, lakes, and subsurface waters of the state for public and private water supply and for agricultural, industrial, and recreational uses. It is therefore declared to be the policy of the State of Georgia that the water resources of the state shall be utilized prudently for the maximum benefit of the people, in order to restore and maintain a reasonable degree of purity in the waters of the state and an adequate supply of such waters, and to require where necessary reasonable usage of the waters of the state . . . To achieve this end, the government of the state shall assume responsibility for the quality and quantity of such water resources and the establishment and maintenance of a water quality and water quantity control program adequate for present needs and designed to care for the future needs of the state.

O.C.G.A. § 12-5-21(a).

**The ACF Basin**

10.     The Chattahoochee River is one of the State of Georgia's most precious natural resources.  The citizens of the State of Georgia rely upon the Chattahoochee River and the federal reservoirs constructed on it to meet vital needs of the citizens of the State of Georgia, including water supply, waste assimilation, recreation, and navigation, and to support the biological needs of a wide variety of species.

11.     The Chattahoochee River rises in the Blue Ridge Mountains in northeastern Georgia and flows through Atlanta to the southwest until it turns south and forms, at its western bank, the border between the States of Georgia and Alabama.  Along the way, the Chattahoochee River runs through the Georgia towns and cities of West Point, Columbus, and Fort Gaines.  The Chattahoochee River joins the Flint River at Lake Seminole at the Florida border.  Upon crossing into Florida, the Chattahoochee River becomes the Apalachicola River and empties into the Apalachicola Bay in the Gulf of Mexico.  The Chattahoochee River is part of what is known as the ACF River Basin.

12.     Except north of Lake Lanier, the flow of the Chattahoochee River is regulated by a series of dams.  Lake Lanier, a Corps reservoir formed by Buford Dam, is situated approximately thirty-five miles north of the City of Atlanta.  Construction of Buford Dam and Lake Lanier began in approximately 1950 and was substantially completed in 1957.  Approximately 155 miles southwest of Lake Lanier, the Chattahoochee River begins to form West Point Lake, a Corps reservoir formed by West Point Dam.  From there, it flows through several dams operated by the Georgia Power Company before flowing into another Corps reservoir, Lake Walter F. George (a.k.a., Lake Eufala).  Farther south, the Chattahoochee River

forms Lake George A. Andrews, another Corps reservoir, then joins with the Flint River at the

Corps' Lake Seminole, the southernmost reservoir within the ACF River Basin.  The

Chattahoochee River flows for a distance of 434 miles from the Blue Ridge Mountains to Lake

Seminole.  Releases from Jim Woodruff Dam at Lake Seminole discharge into the Apalachicola

River.  The Apalachicola River flows for approximately 106 miles from the dam to the Gulf of

Mexico at Apalachicola Bay.  Approximately 74% of the drainage area of the ACF Basin lies

within Georgia.  Lake Lanier, West Point Lake, Lake Walter F. George, and Jim Woodruff Dam

are sometimes hereinafter referred to jointly as the "ACF Reservoirs."

13.     Lake Lanier is located near the headwaters of the Chattahoochee River, and the

flow in the Chattahoochee River into and below Lake Lanier in the upper portion of the ACF

Basin is small, particularly in comparison with the much higher flows downstream in Middle and

Southern Georgia and in Florida.  When Lake Lanier is drawn down significantly, it can take a

long time, even several years, to refill.

### Authorization and Purposes of ACF Reservoirs

14.     Congress authorized construction of reservoir projects for the ACF River Basin

System, including a reservoir or reservoirs on the Chattahoochee River to the north of the City of

Atlanta, in the Rivers and Harbors Act of 1945, Pub. L. No. 79-14, 59 Stat. 10 (the "1945 Act"),

and the Rivers and Harbors Act of 1946, Pub. L. No. 79-525, 60 Stat. 634 (the "1946 Act").

15.     The 1945 Act declares it

> to be the policy of Congress to recognize the interests and rights of
> the states in determining the development of the watersheds within
> their borders and likewise their interests and rights in water
> utilization and control, as herein authorized to preserve and protect
> to the fullest possible extent established and potential uses, for all
> purposes, of the waters of the Nation's rivers; . . . and to limit the

> authorization and construction of navigation works to those in
> which a substantial benefit to navigation will be realized therefrom
> and which can be operated consistently with appropriate and
> economic use of the waters of such rivers by other users.

59 Stat. 10.

16.     The Corps of Engineers' Reports upon which Congressional authorization of what

would become Lake Lanier was based stated and contemplated that a purpose and benefit of

Lake Lanier would be to provide water supply to the metropolitan north Georgia region.  Other

purposes for constructing the reservoir included flood control, hydropower production, and

navigation.

17.     In 1990, Congress passed the Water Resources Development Act of 1990, Pub. L.

No. 101-640 (the "1990 Act"), which directed the Secretary of the Army to "conduct a study of

the operations of reservoir projects which are under the jurisdiction of the Secretary" and "to

identify the purposes for which each such project is authorized; and . . . to identify the purposes

for which each such project is being operated."

18.     Pursuant to the 1990 Act, the Corps published the document entitled <u>Authorized

and Operating Purposes of Corps of Engineers Reservoirs</u>, dated July 1992 and reprinted in

1994.  In <u>Authorized and Operating Purposes of Corps of Engineers Reservoirs</u>, the Corps lists

"Water Supply" as both an "authorized purpose" and an "operating purpose" of Lake Lanier.

The same document distinguishes "authorized" and "operating" purposes of reservoirs, on the

one hand, from reservoir "incidental benefits" on the other, and states that "incidental benefits

are not the subject of this study and thus are not listed in this report."

19.     Corps Regulation ER 1110-2-240, which is codified in the Code of Federal Regulations at 33 C.F.R. § 222.5, Appendix E, lists "Municipal and/or Industrial Water/Supply" as a "Project Purpose" of Buford Dam and Lake Lanier.

20.     Lakes West Point and Walter F. George are, like Lake Lanier, water storage reservoirs that were authorized by Congress to fulfill multiple project purposes.  According to federal regulations, 33 C.F.R. § 222.5, the purposes for West Point Lake include hydropower, navigation, municipal and industrial water supply, low flow augmentation, and recreation. According to the same regulation, the purposes for Lake Walter F. George and Lake Seminole include navigation and hydropower.

### The Corps' Obligation to Promulgate Water Control Plans

21.     The ACF Reservoirs operate as a system to balance multiple purposes and priorities.  To ensure that the appropriate balance is struck — and to ensure that water control decisions affecting millions of people are made in accordance with applicable requirements after consideration of all relevant factors and all appropriate alternatives — the Corps is required to prepare "water regulation manuals" and "water control plans" for each of its reservoirs and for the system as a whole.

22.     The Corps promulgated 33 C.F.R § 222.5, which "prescribes policies and procedures to be followed by the U.S. Army Corps of Engineers in carrying out water control management activities, including establishment of water control plans for Corps and non-Corps projects, as required by Federal laws and directives."  33 C.F.R § 222.5(a).  These regulations apply to "all field operating activities having civil works responsibilities," 33 C.F.R. § 222.5(b),

including the Corps projects on the ACF River Basin System. 33 C.F.R. § 222.5(o) & App. E, South Atlantic Div.

23.     The Corps must prepare a water control plan for "reservoirs, locks and dams, reregulation and major control structures and interrelated systems to conform with objectives and specific provisions of authorizing legislation and applicable Corps of Engineers reports." 33 C.F.R. § 222.5(f)(1).

24.     "Water control plans include coordinated regulation schedules for project/system regulation and such additional provisions as may be required to collect, analyze and disseminate basic data, prepare detailed operating instructions, assure project safety and carry out regulation of projects in an appropriate manner." 33 C.F.R. § 222.5(e)(1).

25.     "The term 'reservoir regulation schedule' refers to a compilation of operating criteria, guidelines, rule curves and specifications that govern basically the storage and release functions of a reservoir.  In general, schedules indicate limiting rates of reservoir releases required during various seasons of the year to meet all functional objectives of the particular project, acting separately or in combination with other projects in a system."  33 C.F.R. § 222.5(e)(2).

26.     In developing a water control plan, the Corps sponsors public involvement activities "to appraise [sic] the general public of the water control plan."  33 C.F.R. § 222.5(g)(2)(i).  When a new water control plan is developed or a water control plan is revised, the Corps is required to sponsor public involvement and public meetings.  33 C.F.R. § 222.5(g)(2)(i)(A).  The Corps is also required to provide information to the public concerning

proposed water control management decisions "at least 30 days in advance of a public meeting." 33 C.F.R. § 222.5(g)(2)(i)(C).

27.     There cannot be a continuing or recurring deviation from approved water control plans.  In the case of a continuing or recurring change, the water control plan must be changed and the required approval obtained from [Corps Headquarters]."  Corps' Engineer Pamphlet (EP) 1165-2-1 (at 18-3 - 18-4) (July 30, 1999).

### The Corps' Existing Water Control Plan for the ACF Reservoirs

28.     The existing Master Manual for the ACF Reservoirs was compiled in 1950, when only one federal project was in place.  Therefore, the existing Master Manual does not include a system-wide water control plan for the ACF Reservoirs.

29.     The Corps has long recognized the need to prepare water control plans for the ACF Reservoirs.  It went so far as to prepare a draft Water Control Plan for the ACF Reservoirs in 1989.

30.     On March 25, 2005, the Corps announced its intention to update the water control plans and manuals for the ACF Reservoirs.  *See* Federal Defendants' Notice of Proposed Actions filed in the U.S. District Court, N.D. Alabama (Civil Action CV-90-01331-E), Doc. No. 311.  In its Notice, the Corps stated that there would be opportunities for public participation and comment.

31.     In a letter dated April 14, 2005, Alabama's U.S. Senators and Representatives wrote Lt. General Carl Strock, Commander and Chief of the Corps of Engineers, opposing the update to the water control plan for the ACF Reservoirs.  *See* Exhibit 2 to Joint Supplemental Brief of the State of Georgia and Atlanta Regional Commission in Opposition to Motions to

Amend by Alabama and Florida, in the U.S. District Court, N.D. Alabama (Civil Action CV-90-01331-E), Doc. No. 325.

32.     On April 26, 2005, the Assistant Secretary of the Army for Public Works sent a letter to Alabama Senator Richard C. Shelby stating that the Corps would "withdraw and disclaim any intention to re-evaluate or update the relevant operating procedures and manuals." *See* Exhibit 3 to Joint Supplemental Brief of the State of Georgia and Atlanta Regional Commission in Opposition to Motions to Amend by Alabama and Florida, in the U.S. District Court, N.D. Alabama (Civil Action CV-90-01331-E), Doc. No. 325.

33.     On March 6, 2006, the Assistant Secretary of the Army for Public Works sent a letter to U.S. Senators from Alabama, Georgia and Florida stating that the process of updating water control plans for the ACF Reservoirs would begin in April 2006 with the issuance of a formal notice.  Although the Corps did issue a formal notice of its intention to implement a settlement agreement with the Water Supply Providers and other parties, the Corps did *not* issue notice of its intention to update water control plans for the ACF Reservoirs.

34.     On May 24, 2006, the United States House of Representatives voted on the Water Resources Appropriations Act of 2007, H.R. 5427.  Section 110 of the version of H.R. 5427 that was voted out of committee stated as follows:  "SEC. 110. None of the funds made available under this Act may be used to revise the master control plans and master manuals of the Corps of Engineers for the Alabama, Coosa, Tallapoosa River basin in Alabama and Georgia or the Apalachicola, Chattahoochee, Flint River Basin in Alabama, Georgia, and Florida."  On information and belief, Sec. 110 of H.R. 5427 was introduced by representatives of the State of

Florida by way of a manager's amendment that was not debated in the subcommittee but was inserted prior to the full committee vote.

35.     During the floor debate on H.R. 5427, Rep. Nathan Deal of Georgia introduced House Amendment 913 to strike Sec. 110 from the bill.  Representatives from the State of Georgia rose to speak in support of the Deal Amendment while representatives of Florida and Alabama rose to speak in opposition.  The Deal amendment passed, and the limiting language was therefore stricken from the bill.

36.     Notwithstanding the defeat of the rider that Florida had tried to insert into H.R. 5424 to prevent the Corps from fulfilling its duty to update water control plans for the ACF Reservoirs, on information and belief, Secretary Woodley subsequently informed representatives of the States of Georgia, Alabama and Florida that the Corps had decided not to update water control plans for the ACF Reservoirs.

37.     Notwithstanding these efforts to prevent the Corps from acceding to their demands, Alabama continues to assert claims in litigation against the Corps demanding that the Corps update water control plans for the ACF Reservoirs.

38.     On February , 2008, the Corps again announced its intention to update the water control plans and manuals for the ACF Reservoirs.  *See* 73 Fed. Reg. 9,780 (Feb. 22, 2008).  The Corps later announced that it would hold a series of public hearings related to the update of the water control plans and manuals for the ACF Reservoirs in late October of 2008.  *See* 73 Fed. Reg. 54,391 (Sept. 19, 2008).

## Public Involvement

39.     The Corps is required to provide an opportunity for the public to review and

comment on certain changes in the operation of federal reservoirs.

40.     In this regard, Section 5 of the Water Resources Development Act of 1988, Public

L. No. 100-676, 102 Stat. 4022, provides:

>       (i)     Before the Secretary [of the Army] may make changes in the operation of
> any reservoir which will result in or require a reallocation of storage space in such reservoir or
> will significantly affect any project purpose, the Secretary shall provide an opportunity for public
> review and comment.

33 U.S.C. § 2312.

## NEPA

41.     The National Environmental Policy Act ("NEPA") requires a federal agency to

perform an Environmental Impact Statement ("EIS") before it initiates any "major Federal

action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An

EIS is a "detailed statement by the responsible official" of the agency that discusses:

> (i)  the environmental impact of the proposed action;

> (ii) adverse environmental effects that cannot be avoided should
> the proposal be implemented;

> (iii) alternatives to the proposed action;

> (iv) the relationship between local short-term uses of man's
> environment and the maintenance and enhancement of long-term
> productivity; and

> (v) any irreversible or irretrievable commitments of resources that
> would be involved in the proposed action should it be
> implemented.

*See* 42 U.S.C. § 4332(C).

### The IOP

42.     In a March 7, 2006 letter from the Mobile District of the Corps to the FWS, the Corps requested the initiation of formal consultation pursuant to Section 7 of the ESA "on our existing operations at Jim Woodruff Dam."  A true and correct copy of the March 7, 2006 letter (without its voluminous attachments except for Enclosure 1, which summarizes the IOP) is attached to Georgia's Original *Georgia II* Complaint as Exhibit A.

43.     The March 7, 2006 letter stated that the Corps had previously intended to initiate ESA consultation "for existing water control operations within the ACF system, as well as formal consultation for proposed updates or revisions to water control plans necessary to implement water supply reallocations in the basin," but that the Corps had been precluded from doing so by agreements, interstate compacts, and litigation.  *Id.* at p. 2.  The letter explained that the Corps intended to update the water control plans for the ACF Reservoirs to reflect existing operations, and formally consult regarding those plans, as part of implementation of a settlement in *Southeastern Federal Power Customers v. Caldera*, 00-CV-02975 (D.D.C.), and that the scope of the present consultation was limited to operations at JWLD for the remainder of calendar year 2006 and until formal Section 7 consultation could be completed on water control plans for the ACF Basin.  *Id*. at pp. 2-3.

44.     In the March 7, 2006 letter, the Corps disclosed its intention to operate in accordance with the IOP pending completion of Section 7 consultation on the Corps "existing water control plans for the ACF Basin."  The Corps further stated: "These interim operations concentrate on operations and releases from Jim Woodruff Dam to the Apalachicola River, taking into consideration composite storage available in upstream reservoirs but not addressing

detailed operations at the upstream reservoirs.  Such detailed operations would be addressed

during the future update of the existing water control plans for the ACF basin." *Id.* at p. 15.

45.     The IOP itself, as originally proposed and implemented, required various releases

from JWLD for two periods: the spring (March through May) and the rest of the year (June

through February).  The releases that the Corps is required to make from JWLD depend upon the

amount of "Basin Inflow" – a defined term that is roughly equivalent to the amount of water that

is flowing into the ACF Reservoirs.  In addition, the IOP prescribes certain "down ramping

rates," which prohibit the Corps from reducing the river stage in the Apalachicola River more

than a certain amount per day, even if Basin Inflows or the amount of water naturally entering

the ACF Reservoirs dropped more precipitously.  The specific rules under the IOP as it was

described in the Corps' March 7, 2006 letter could be summarized as follows:

> During the months of March through May: (a) when Basin Inflows
> are greater than or equal to 37,400 cubic feet per second (cfs), the
> Corps would release no less than 37,400 cfs from JWLD; (b) when
> Basin Inflows are between 20,400 cfs and 37,400 cfs, the Corps
> would release between 70% and 90% of Basin Inflows, but not less
> than 20,400 cfs, from JWLD; and (c) when Basin Inflows are less
> than 20,400 cfs, the Corps would release 100% of Basin Inflows,
> but not less than 5,000 cfs, from JWLD.
>
> From June through February:  (a) when Basin Inflows are greater
> than or equal to 37,400 cfs, the Corps would release no less than
> 37,400 cfs from JWLD; (b) when Basin Inflows are between 8,000
> cfs and 37,400 cfs, the Corps would release between 70% and 90%
> of Basin Inflows, but not less than 8,000 cfs, from JWLD; and (c)
> when Basin Inflows are less than 8,000 cfs, the Corps would
> release 100% of Basin Inflows, but not less than 5,000 cfs, from
> JWLD.
>
> The protocol also set forth certain rules limiting the rates at which
> the Corps would ramp-down releases from JWLD (between .25
> and 1 foot per day, depending on the current release range) as
> Basin Inflows fall.

46.     Although the IOP does not specify the releases that the Corps must make from each of the ACF Reservoirs, by requiring the release from JWLD of all or a substantial portion of Basin Inflow to the entire ACF Basin, rather than merely inflow into JWLD, and because by the Corps' own description, JWLD "is essentially a 'run-of-river' project with very limited storage capabilities," the IOP materially affects releases from and reservoir levels in not only JWLD but also Lake Lanier, West Point Lake, and Lake Walter F. George.

47.     The Corps developed the IOP without any public input, opportunity for public comment, or public hearings. The Corps first gave notice of the IOP by issuing it in final form in the March 7, 2006 letter.

48.     The Corps began applying the IOP to the operation of the ACF Reservoirs in March 2006.

49.     Georgia began monitoring reservoirs levels, Basin Inflows, and river flow as soon as the Corps announced the IOP. By April 2006, it had become clear to Georgia that the Corps' continuing application of the IOP to the operation of the ACF Reservoirs could have a devastating impact upon the ACF River Basin.

50.     In the development and implementation of the IOP, the Corps made serious errors.

51.     The Corps in developing the IOP did not adequately take into account the potential for very dry weather.

52.     The release quotas of the IOP are too high, and require the Corps to release water that should be stored so that the Corps has the water to augment flows at the driest times to refill the ACF Reservoirs.

53.    In support of its restriction on "down ramping," the Corps in the IOP states: "Apalachicola River fall rates of greater than 0.5 ft/day were extremely rare prior to construction of the Corps ACF projects (analysis of gage records from the 1920s to the present), except during flood pulses."  In fact, fall rates of greater than .5 feet per day were not uncommon prior to construction of the ACF Reservoirs, with the natural variation in inflows to the ACF Basin accounting for such decreases in the river stage.  In addition, without any manipulation of the river flow by storage or release of water from the ACF Reservoirs, fall rates of greater than .5 feet per day in 2006 and the first half of 2007 would have been frequent because of natural variations in inflows into the ACF River Basin.

54.    The IOP and the Corps' analysis of the potential effect of operating under the IOP are seriously flawed because the IOP establishes only minimum thresholds or quotas for releases, which the Corps can simply exceed.  In fact, the Corps has routinely released more water from JWLD than the IOP requires.  The Corps' analyses of the effects on the ACF Reservoirs of the IOP assume that the Corps is releasing only the minimum amounts required by the IOP and no more.

55.    As explained in greater detail below, the Corps based the IOP on erroneous assumptions regarding the flows in the Apalachicola River that are necessary to meet the needs of the ACF Species.

*Gulf Sturgeon*

56.    There is no evidence in the record that the quantity or flow of water below JWLD played any role in the Gulf sturgeon's decline or has in any way limited the recovery of the Gulf sturgeon.

57.     There is no evidence in the record that limited spawning success has limited the Gulf sturgeon's population within the Apalachicola River.

58.     There is no evidence in the record that the quantity of flows during the spawning season bears any correlation to year-class recruitment for Gulf sturgeon in the Apalachicola River.

59.     There is no evidence in the record that hydrological conditions in the Apalachicola River have limited the availability of suitable spawning habitat for Gulf sturgeon in the Apalachicola River such that spawning success has been impaired by a lack of suitable spawning habitat.

60.     There is no evidence in the record to suggest that spawning success has been limited at all for the Gulf sturgeon that spawn in the Apalachicola River.

61.     There is no evidence in the record to indicate that the population "bottleneck" for the Apalachicola River Gulf sturgeon is in spawning success, as opposed to other aspect of the sturgeon's life cycle, such as the period after the spawn during the first year of a Gulf sturgeon's life.

62.     There is no evidence in the record as to the quantity of water that must be present in the Apalachicola River for Gulf sturgeon to spawn successfully in the Apalachicola River.

63.     There is no evidence in the record that the flows prescribed in the IOP during the months of March through May are necessary to allow Gulf sturgeon to spawn  successfully in the Apalachicola River.

64.     There is no evidence in the record that Gulf sturgeon eggs or larvae were ever exposed as a result of the Corps' reservoir operations prior to the adoption of the IOP.

65.     There is not evidence in the record that the particular flows that the IOP prescribes are necessary to sustain Gulf sturgeon eggs, larvae, or young-of-year fish.

*Federally-Protected Mussels*

66.     There is no evidence in the record that the flow requirements of the IOP for March through May are necessary to provide habitat for host fish for federally-protected mussel species or to avoid an adverse impact to such host fish, or that the population of host fish in the Apalachicola River have caused or contributed to the decline of federally-protected mussel species in the Apalachicola River.

67.     During the months of June through February, the IOP is intended to provide sufficient flow in the Apalachicola River to prevent the fat threeridge mussel, purple bankclimber mussel, and Chipola slabshell mussel from becoming exposed on dry river banks or areas that become disconnected from the main river channel as flows in the Apalachicola River decline during dry periods.

68.     There is no evidence in the record that the continued existence of the fat threeridge mussel species, the purple bankclimber mussel species, or the Chipola slabshell mussel species was jeopardized by the Corps' reservoirs operations in the ACF prior to the adoption of the IOP.  There is no evidence in the record that the releases prescribed by the IOP are necessary to avoid jeopardy to the continued existence of the fat threeridge mussel species, the purple bankclimber mussel species, or the Chipola slabshell mussel species.

69.     Under the original IOP, during the months of March through May, the Corps is required under the IOP to increase releases from JWLD as Basin Inflow in the ACF Basin increases, at least until Basin Inflow reaches 8,000 cfs.  During the same months, the IOP

generally requires the Corps to increase releases from JWLD as Basin Inflow to the ACF Basin

increases, up to 37,400 cfs.

70.    The Corps is required under the IOP to increase releases from JWLD as Basin

Inflow increases, regardless of the quantity of water in the Apalachicola River on the day or days

preceding the date on which the release from JWLD is to occur and even if the increase in the

flow of the Apalachicola River is not necessary to inundate significant numbers of fat threeridge

mussels, purple bankclimber mussels, or Chipola slabshell mussels with flowing water.

71.    The ramping limitations of the IOP limit the rate at which the Corps can reduce

releases from JWLD as Basin Inflow decreases, even when Basin Inflow or the flow in the

Apalachicola River would decline naturally more rapidly than the ramping limitations allow, and

even when significant numbers of fat threeridge mussels, purple bankclimber mussels, and

Chipola slabshell mussels will not be harmed by reducing releases from JWLD by more than the

IOP allows.

72.    Under the original IOP, the Corps was required to release a minimum of 5,000 cfs

from JWLD for the benefit of the fat threeridge mussel species and the purple bankclimber

mussel species, regardless of how far below 5,000 cfs Basin Inflow may fall, how long Basin

Inflow may fall below 5,000 cfs, what the natural flow in the Apalachicola River otherwise

would be, or the amount of conservation storage that remains at the time in the ACF Reservoirs.

*Georgia's Response to the IOP*

73.    In multiple detailed letters to the Corps and the FWS during May and June of

2006, the State of Georgia voiced concerns regarding the effect that the IOP could have on the

capacity of the ACF Reservoirs to meet the full needs of the ACF Basin, and requested changes

to the IOP.  True and correct copies of these letters are attached to Georgia's Original *Georgia II* Complaint as Exhibits B-F.  Georgia also provided oral and written comments to the Corps and the FWS during the formal consultation showing that the IOP provided greater flows in the Apalachicola than were needed to avoid the take of the ACF Species or adverse modification of their habitat, and that the IOP could significantly deplete the system conservation storage in the ACF Reservoirs to the potential detriment of the ACF Species and other needs within the ACF Basin.

74.     In a letter dated June 12, 2006 to the U.S. Fish and Wildlife Service, the Corps changed the focus of the Section 7 consultation to the IOP as opposed to the Corps' pre-IOP operations.  In the June 12, 2006 letter, the Corps also announced changes to the IOP, including changing from 37,400 to 23,000 the upper flow threshold for the months June through February below which a portion of Basin Inflow could be stored; changing the time period over which Basin Inflows are calculated; tying the point of compliance for release of Basin Inflow to the Chattahoochee gage in the Apalachicola River; and clarifying how releases for gradual ramping rates are to be captured in the calculation of Basin Inflow released so as allow the Corps to "compensate for and minimize the potential for over-releasing due to the gradual ramping rates." The Corps subsequently adopted these modifications to the IOP.  The modifications to the IOP announced in the June 12, 2006 letter are hereinafter referred to as "IOP Revision 1."

75.     IOP Revision 1 did not remedy significant flaws in the IOP that cause the IOP to significantly deplete the ACF Reservoirs.

*Motions for Temporary Restraining Order*

76.     On June 20, 2006, Georgia filed this action in the Atlanta Division of the Northern District of Georgia seeking judicial review of the IOP.  Georgia also filed a motion for temporary restraining order to stop the precipitous decline of storage in Lake Lanier.

77.     On June 21, 2006, the State of Florida filed a motion for temporary restraining order in Case Number 90-1331 (N.D. Alabama) (hereinafter, the "*Alabama* Case"), alleging that operations under the IOP were resulting in "take" of protected mussels under the Endangered Species Act.

78.     On June 22, 2006, the United States District Judge in the Northern District of Alabama granted Florida's motion for temporary restraining order in the *Alabama* Case without notice to the opposing parties, *see* NDAL 90-1331, Doc. 478.  The order granting the temporary restraining established a required minimum flow of 8,000 cfs at the Chattahoochee gage.

79.     From June 23 to June 29, 2006, the United States District Judge in the Northern District of Alabama entered a series of orders in the *Alabama* Case revising the June 22 temporary restraining order, gradually lowering the minimum flow from 8,000 cfs to 6,000 cfs.

*The Interim Reservoir Management Agreement and TRO Orders*

80.     From June 30 until July 24, 2006, the Corps suspended operation under the IOP and began to operate, instead, under the terms of an Interim Reservoir Management Agreement that was negotiated among certain parties to the *Alabama* Case.  *See* NDAL 90-01331 Doc. 490-1.

81.     Shortly before the Interim Reservoir Management Agreement was set to expire on July 24, 2006, the State of Florida filed a motion for temporary restraining order in the *Alabama* case.

82.     On July 25, 2006, the United States District Judge for the Northern District of Alabama denied the State of Florida's motion for temporary restraining order in the *Alabama* Case, NDAL 90-01331 Doc. 506, allowing the Corps to resume operations under the IOP.

*The September 5, 2006 Biological Opinion*

83.     On September 5, 2006, the FWS issued its Biological Opinion regarding the IOP, as modified by IOP Revision 1.  The Biological Opinion contained the FWS's findings and conclusions regarding the impact of the Corps' operations under the IOP upon the ACF Species.

84.     In the Biological Opinion, the FWS concluded that the Corps' operations pursuant to the IOP would not appreciably affect the survival and recovery of the federally-protected species that were the subject of the Biological Opinion nor appreciably affect the ability of their critical habitats to serve the essential functions of such habitats.  The Biological Opinion stated that the IOP could cause the "take" of the fat threeridge and purple bankclimber mussels within the meaning of the Endangered Species Act if the Corps' storage of water in the ACF Reservoirs (rather than releasing it downstream) allowed these mussels to be exposed or allowed them to become isolated in pools separated from flowing water.

85.     Based upon its incorrect conclusion that the IOP might cause a "take" of federally-protected mussels in low flow conditions, the FWS, pursuant to Section 7(b)(4)(C) of the Endangered Species Act, issued reasonable and prudent measures that the Corps must follow in order to obtain protection against liability for the death of individual mussels.

86.    In "reasonable and prudent measure 2" ("RPM2"), the FWS addressed the 8,000 cfs threshold in the IOP for Basin Inflows.  Under the IOP, as it existed prior to issuance of the Biological Opinion, for the period of June through February, when the Basin Inflows were greater than or equal to 8,000 cfs, the Corps could begin storing up to 30% of Basin Inflows.  In RPM2, the FWS stated that it believed that it was necessary for the Corps to "[r]eplace the proposed 8,000 cfs threshold in the IOP with a threshold of 10,000 cfs."

87.    In response to RPM2, by letter dated September 7, 2006, the Corps announced that it would modify the IOP to replace the 8,000 cfs threshold at which the Corps could begin storing Basin Inflows with a threshold of 10,000 cfs.  This modification to the IOP is hereinafter referred to as "IOP Revision 2."

88.    In "reasonable and prudent measure 3" ("RPM3"), the FWS stated that it believed that in order to mitigate the potential take of federally-protected species, it was necessary for the Corps to "[d]evelop modifications to the IOP that provide a higher minimum flow [above 5,000 cfs] to the Apalachicola River when reservoir storage and hydrologic conditions permit."  The Biological Opinion further stated, "The Corps, with FWS concurrence, shall initiate by January 30, 2007, IOP drought provisions that identify the reservoir, climatic, hydrologic, and/or listed species conditions that would allow supporting a higher minimum flow in the Apalachicola River, and that identify recommended water management measures to be implemented when conditions reach the identified drought trigger point(s). . . . If modifications to the IOP parameters for the months of March through May are adopted as part of the drought provisions, the Corps shall assess potential affects [sic] to Gulf sturgeon spawning and floodplain inundation."

*The Corps' Post-Hoc NEPA Documentation for the IOP*

89.     In October 2006, the Corps issued its NEPA documentation for the IOP, consisting of an Environmental Assessment and Finding of No Significant Impact.

90.     The Environmental Assessment on the IOP states that the no action alternative against which the proposed action was compared was the "low flow protocol" that the Corps claims to have developed during 2004 and 2005.

91.     In the Environmental Assessment on the IOP, the Corps concluded that the IOP would not significantly affect reservoir levels, water supply, or recreation in Lakes Lanier, West Point, and Walter F. George.

92.     The Finding of No Significant Impact on the IOP states that because the IOP will not have any significant human or environmental impacts, an Environmental Impact Statement is not required.

*RPM3 and IOP Revision 3*

93.     At a public workshop that the Corps convened on December 13, 2006, Georgia and representatives from the Atlanta Regional Commission suggested changes to the IOP in response to RPM3.  At the public workshop and in a letter from Dr. Carol Couch to the Corps dated January 9, 2007, Georgia  stated that the IOP's release requirements for the months of March through May produce flows that are unnecessarily high, wasteful, potentially counterproductive and even damaging to the Gulf sturgeon; that these release requirements, in combination with the other provisions of the IOP, do not allow sufficient opportunity for refill of the ACF Reservoirs; and that in prolonged dry periods, the IOP could result in substantial loss of

storage in the ACF Reservoirs on a sustained basis and could have a catastrophic effect on the needs of the ACF Species and other needs within the ACF Basin.

94.     At the workshop and in the January 9, 2007 letter, Georgia recommended and requested that the Corps either replace the IOP entirely, or at a minimum make the following specific adjustments to the flow thresholds under the IOP:  (i) abolish the year-round 37,400 cfs upper flow threshold completely; (B) for the Gulf sturgeon spawning season, establish 10,000 to 11,000 cfs as the desired flow when Basin Inflow permits, and store Basin Inflows in the ACF Reservoirs above this level; (C) avoid releases above 23,000 cfs except when necessary for flood control operations; and (D) for the months of June-February, store 100% of Basin Inflow above the 5,000 cfs minimum flow unless the elevations of the ACF Reservoirs are such that, based upon best available climate forecasts, the ACF Reservoirs will refill during the following spring.

95.     At the workshop and in the January 9, 2007 letter, Georgia further recommended and requested that the Corps loosen rampdown rate restrictions and offset loss of storage due to rampdown by releasing less than actual Basin Inflow as Basin Inflow rises and peaks and at other times.

96.     In a letter dated February 16, 2007 to the FWS, the Corps announced that it had modeled and was proposing a modification to the IOP in response to RPM3.  This revision, which the Corps refers to as "Concept 5," is hereinafter referred to as "IOP Revision 3."  In the February 16, 2007 letter, the Corps stated that under IOP Revision 3, the Corps would "provide for a higher desired minimum flow of 6,500 for normal to wet years," would lower the minimum flow to 5,000 cfs when composite storage in the ACF Reservoirs falls to the top of Zone 3, and

that the Corps would lower "the storage/flow thresholds during the March-May spawning period to 35,800 cfs and 18,000 cfs, respectively."

97.     The February 16, 2007 letter referenced and enclosed a Biological Assessment of Revision 2 in which the Corps concluded that the IOP, as revised by Revision 3, would meet the objectives of RPM3.

98.     The FWS announced its approval of Revision 3 by letter dated February 28, 2007.

*The Corps' NEPA Documentation for Revision 3*

99.     The Corps prepared an Environmental Assessment of Revision 3 dated March 6, 2007.  According to the Environmental Assessment, the "no action" alternative against which IOP Revision 3 was studied was the IOP as modified by IOP Revision 2.

100.    The alternatives against which the Corps analyzed IOP Revision 3 involved raising the 5,000 minimum flow of the IOP, but none involved significantly reducing the upper flow quotas (levels above which the Corps can store a percentage of Basin Inflow).

101.    In the Environmental Assessment, the Corps concluded that IOP Revision 3 would have no adverse impact upon elevations of the ACF Reservoirs, water supply, recreation, or other needs in the ACF Basin.

102.    In a Finding of No Significant Impact dated March 6, 2007, the Corps concluded that IOP Revision 3 "would have no significant environmental human impacts.  Therefore, an environmental impact statement is not required."

*The Corps' Over-Releases*

103.    On May 16, 2007, in a letter from the Corps to the FWS, the Corps announced the manner in which it would conduct "volumetric balancing of releases" (correction for over-

releases) as provided in IOP Revision I.  The May 16, 2007 letter indicated that the Corps would place a number of constraints on the volumetric balancing (over-release correction mechanism), particularly at times when Basin Inflow is extremely low, thereby effectively preventing the Corps from correcting over-releases in many or all instances when the need to do so is the greatest.  The May 16, 2007 letter also stated that the Corps' net over-release (above flows required under the IOP) since September 2006 was "appropriate since the IOP minimum release schedule is a minimum flow schedule rather than a target flow schedule," thereby contradicting the principle that over-releases are to be avoided or corrected.

*Reservoir Elevations Resulting from the IOP*

104.    As a result of the Corps' application of the IOP, the amount of water stored in the ACF reservoir system dropped precipitously from March 7 through late October 2006, and Lake Lanier was unable to refill in 2006 and 2007 and has been unable to refill at any time to date in 2008.

105.    Drought conditions continued to worsen throughout 2007.  In December of 2007, the elevation at Lake Lanier fell to its lowest elevation since the project was originally filled.

106.    In developing the IOP, the Corps failed to anticipate a drought of the severity or duration as the drought experienced in the ACF Basin from 2006 through the present date.

*Georgia's Motion for Preliminary Injunction*

107.    Although inflows to the ACF Basin were at record low levels in the fall of 2007 and basin inflow remained significantly below the 5,000 cfs flow required by the IOP, the Corps continued to operate its projects in the ACF Basin according to the provisions of the IOP.

108.    The Corps' own projections showed that, if the Corps continued to make the

releases dictated by the IOP, there would be a substantial risk that the federal storage reservoirs

in the ACF Basin—Lake Lanier, West Point Lake, and Lake Walter F. George—could be

drained of all conservation storage and that, as a result, the flow in the Chattahoochee River and

Apalachicola River could drop severely.

109.    As a result of the extraordinary drought conditions and the risk to the water

supplies for much of the metro Atlanta area, on October 19, 2007, the State of Georgia filed a

Motion for Preliminary injunction seeking an order that the Corps operate as follows:

> (1) While Adjusted Basin Inflow is below 5,000 cubic feet per
> second (cfs), the Corps shall release no more water from JWLD
> than is necessary to maintain a flow, as measured at the
> Chattahoochee gage on the Apalachicola River, equal to Adjusted
> Basin Inflow;
>
> (2) When Adjusted Basin Inflow exceeds 5,000 cfs, the Corps shall
> release no more water than necessary to maintain a flow, as
> measured at the Chattahoochee gage on the Apalachicola River, of
> 5,000 cfs;
>
> (3) The Corps shall not deviate from the foregoing flow
> requirements because of any "rampdown" restrictions.
>
> "Adjusted Basin Inflow" is defined as the amount of water that
> would flow by Woodruff Dam during a given time period if all of
> the Corps' reservoirs maintained a constant water surface elevation
> during that period, plus Georgia's municipal and industrial
> consumptive demands from the Chattahoochee River and Lake
> Lanier (which are deemed for purposes of this order to be 457 cfs
> during October, 369 cfs during November, 352 cfs during
> December, 302 cfs during January, and 345 cfs during February).

*Exceptional Drought Operations*

110.    In response to Georgia's Motion for Preliminary Injunction, on November 1,

2007, the Corps issued a letter to the FWS requesting expedited consultation on the Corps'

proposed Exceptional Drought Operations ("EDO").  The Corps further modified the proposed

EDO in a letter to the FWS dated November 7, 2007.  The proposed EDO, as revised, would

allow the Corps to temporarily suspend the requirements of the IOP and would allow the Corps

to reduce flows at the Chattahoochee gage on the Apalachicola River to as low as 4,150 cfs.  The

Corps' November 7, 2007 modification amended the proposed EDO to allow for an initial

reduction down to 4,750 cfs.  The Corps then expressed its intent to "continue to work with the

USFWS to determine the appropriate triggers or criteria to indicate when the EDO will provide

for reductions in the minimum flow from 4750 to 4500 and from 4500 to 4150."

111.    On November 15, 2007, the FWS issued an amended biological opinion

evaluating the potential impacts of the EDO ("EDO BiOp").  In the EDO BiOp, the FWS limited

the time period under which the EDO would operate to June 1, 2008.  The EDO BiOp stated that

the Corps would need to reinitiate consultation for operations at JWLD beyond that date.

112.    In the EDO BiOp, the FWS concluded that the Corps' operations pursuant to the

EDO would not appreciably affect the survival and recovery of the federally-protected species

that were the subject of the Biological Opinion nor appreciably affect the ability of their critical

habitats to serve the essential functions of such habitats.  The EDO BiOp stated that the EDO

could cause the "take" of the fat threeridge, purple bankclimber, and Chipola slabshell mussels

within the meaning of the Endangered Species Act if the Corps reduced flows at the

Chattahoochee gage to 4,750 cfs and then again to 4,500 cfs.

113.    Based upon its incorrect conclusion that the EDO might cause a "take" of

federally-protected mussels in low flow conditions, the FWS, pursuant to Section 7(b)(4)(C) of

the Endangered Species Act, issued reasonable and prudent measures that the Corps must follow

in order to obtain protection against liability for the death of individual mussels.

*The Corps' NEPA Documentation for the EDO*

114.    The Corps prepared an Environmental Assessment of the EDO dated November

16, 2007.  According to the Environmental Assessment, the "no action" alternative against which

the EDO was studied was the current water control operations at Jim Woodruff dam which

consisted of the IOP as modified by IOP Revision 3.  The Corps rejected continued operations

under IOP Revision 3 because "[b]ased on our modeling of the no action alternative under

extreme drought hydrology, the Composite Conservation Storage of the system would be

depleted thus 'breaking' the system in the event of a multi-year drought which has a reasonable

chance of occurring given meteorological forecasts."

115.    In the Environmental Assessment, the Corps concluded that EDO would have no

adverse impact upon elevations of the ACF Reservoirs, water supply, recreation, or other needs

in the ACF Basin.

116.    In a Finding of No Significant Impact dated November 16, 2007, the Corps

concluded "that the EDO would have no significant environmental human impacts.  Therefore,

an environmental impact statement is not required."

*The Revised IOP*

117.    On April 15, 2008, the Corps issued a letter to the FWS requesting the initiation

of formal consultation under the ESA for a revised version of the IOP (the "RIOP").  In its letter,

the Corps stated that prior consultations had revealed that previous versions of the IOP raised

two issues that needed to be addressed: "1) incorporation of some form of drought plan, and 2) additional need for storage conservation when system storage is low."

118.    The RIOP divided the year into three "seasons": the spawning season from March through May, the non-spawning season from June through November, and the winter season from December through February.  Like the prior versions of the IOP, the RIOP specifies a minimum discharge and a maximum fall rate for releases from the Jim Woodruff Dam and places limitations on the Corps' ability to refill projects within the ACF system.

119.    In developing and implementing the RIOP, the Corps failed to correct the inherent flaws in the IOP.

120.    On June 1, 2008, FWS issued a biological opinion regarding the Corps' proposed RIOP (the "RIOP BiOp").

121.    In the RIOP BiOp, the FWS concluded that the Corps' operations pursuant to the RIOP would not appreciably affect the survival and recovery of the federally-protected species that were the subject of the Biological Opinion nor appreciably affect the ability of their critical habitats to serve the essential functions of such habitats.  The RIOP BiOp stated that the RIOP could cause a "take" of Gulf sturgeon eggs and larvae when the Corps allows the river stage to decline rapidly, especially during drought contingency operations.  The RIOP BiOp also stated that the RIOP could cause the "take" of the fat threeridge, purple bankclimber, and Chipola slabshell mussels within the meaning of the Endangered Species Act if the Corps reduced flows at the Chattahoochee gage to 4,500 cfs.

122.    Based upon its incorrect conclusion that the EDO might cause a "take" of federally-protected mussels and Gulf sturgeon eggs and larvae in low flow conditions, the FWS,

pursuant to Section 7(b)(4)(C) of the Endangered Species Act, issued reasonable and prudent

measures that the Corps must follow in order to obtain protection against liability for the death of

individual mussels and Gulf sturgeon eggs and larvae.

*The Corps' NEPA Documentation for the RIOP*

123.     The Corps prepared an Environmental Assessment of the RIOP dated June 1,

2008.  According to the Environmental Assessment, the "no action" alternative against which the

RIOP was studied was the water control operations at Jim Woodruff dam consisting of the IOP

as modified by IOP Revision 3.  Because the EDO BiOp terminated on June 1, 2008, the Corps

did not consider the EDO to be the "no action" alternative.  The Corps rejected the operations as

described by IOP Revision 3, stating that the "no action" alternative "was not feasible given the

impact the drought has had and continues to have on the composite storage.  This alternative was

deemed not a fair balance between providing more opportunities to conserve storage for future

augmentation flows and continued flow support to threatened and endangered species and the

multiple project purposes in the basin."

124.     In the Environmental Assessment, the Corps concluded that RIOP would have no

adverse impact upon elevations of the ACF Reservoirs, water supply, recreation, or other needs

in the ACF Basin.

125.     In a Finding of No Significant Impact dated November 1, 2008, the Corps

concluded "that the RIOP would have no significant environmental human impacts.  Therefore,

an environmental impact statement is not required."

126.     The Corps continues to operate under the terms of the IOP as modified by the

April 15, 2008 revision and has not indicated an intent to further modify the IOP.

## COUNT I: ADMINISTRATIVE PROCEDURE ACT:
## JUDICIAL REVIEW OF INTERIM OPERATIONS PLAN

127.    The State of Georgia incorporates by reference the allegations of paragraphs 1-126 above as though fully set forth herein.

128.    The IOP, in its current form as revised and described in the Corps' letter to the FWS dated April 15, 2008, constitutes a final agency action reviewable under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

129.    Upon information and belief, the Corps presently does not intend to discontinue operating under the IOP, nor has the Corps announced any intention to further modify the IOP.

130.    Georgia, having the sovereign duty to protect the natural resources of the State, including water, has standing to bring this action challenging the Corps' adoption of the IOP, and the Corps' adoption of the IOP has caused actual injury to litigable interests of the State of Georgia.

131.    All conditions precedent to the bringing of this action, including the exhaustion of any administrative remedies, have been satisfied.

132.    Title 5 U.S.C. § 706 states that a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" or "without observance of procedure required by law."

133.    In adopting the IOP, the Corps failed to consider facts that are critical to the development of appropriate operational rules for the ACF Reservoirs, including the possibility of very dry or drought conditions and the critical need to store water that is not required to maintain flows for the ACF Species.

134.    In adopting the IOP, the Corps failed to consider the multi-year impact of the IOP upon the ACF Reservoirs.

135.    In adopting the IOP, the Corps relied on incorrect data or assumptions regarding the quantities of water that are necessary for or beneficial to the ACF Species and the effect of certain releases on the ACF Basin reservoirs.

136.    The Corps has released significantly greater levels of water than required by the IOP and has not analyzed the actual and potential effects on the ACF Reservoirs of the releases that it is making.

137.    In adopting the IOP, the Corps failed to follow proper procedures for development of water control plans in that it did not sponsor public involvement or public meetings.

138.    The IOP represents a significant change in the operation of the ACF Projects.

139.    The IOP requires or results in a *de facto* reallocation of reservoir storage in the ACF Projects, including Lake Lanier, for the purposes of fish and wildlife conservation and downstream flow augmentation in the Apalachicola River.

140.    The IOP also significantly affects the purposes of the ACF Projects, including the water supply purpose of Lake Lanier.

141.    The Corps violated Section 5 of WRDA 1988, 33 U.S.C. 2312 by failing to provide an opportunity for the public to review and comment on the IOP prior to its adoption and implementation.

142.    In adopting the IOP, the Corps violated NEPA.

143.     The IOP is a "major Federal action[s] significantly affecting the quality of the human environment" within the meeting with NEPA.

144.     The Corps failed to prepare an EIS in conjunction with the IOP as required by NEPA.

145.     The Corps prepared the Environmental Assessments on the IOP only after developing, adopting, and implementing the IOP.

146.     The no action alternatives that the Corps utilized in its NEPA reviews of the IOP were factually and legally erroneous and inappropriate.

147.     The Corps' finding in its NEPA documentation that the IOP will not significantly affect reservoir levels, water supply, recreation, and other needs in and from Lake Lanier, West Point Lake, and Lake Walter F. George were clearly erroneous.

148.     The manner in which the Corps undertook its NEPA analysis on the IOP, and the contents of its NEPA documentation on the IOP, reflect that the Corps did not take "hard look" at the impact of the IOP on the ACF Reservoirs, water supply, recreation, and other needs in the ACF Basin.

149.     The IOP should be held unlawful and set aside because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"  5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right,"  5 U.S.C. § 706(2)(C), and "without observance of procedure required by law," 5 U.S.C. § 706(2)(D).

150.     The Corps' adoption and application of the IOP has caused the State of Georgia actual and substantial injury by reducing the amount of water stored in the ACF Reservoirs in Georgia during 2006, 2007, and 2008 far below levels that are customary and prudent and

threatening the ability of the ACF Reservoirs and the Chattahoochee River to meet Georgia's needs.

151.    The IOP is having immediate, adverse, irreparable consequences requiring injunctive relief that prohibits the Corps from continuing to operate under the IOP.

152.    As a result of the foregoing, the State of Georgia is entitled to an order setting aside the IOP.

## COUNT II: ADMINISTRATIVE PROCEDURE ACT:
## JUDICIAL REVIEW OF THE CORPS' FAILURE TO ADOPT
## WATER CONTROL PLANS FOR THE ACF BASIN

153.    Georgia ARC incorporates by reference the allegations of paragraphs 1-152 above as if fully set forth herein.

154.    The APA states that a court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

155.    Pursuant to 33 C.F.R. § 222.5(f)(1), the Corps must prepare a water control plan for "reservoirs, locks and dams, reregulation and major control structures and interrelated systems to conform with objectives and specific provisions of authorizing legislation and applicable Corps of Engineers reports."

156.    The Corps has failed to update water control plans for the ACF Basin as required under 33 C.F.R. § 222.5(f)(1) and refused to commit to updating such water control plans by any date certain.

WHEREFORE, the State of Georgia prays that this Court:

A.    Issue an order setting aside the IOP;

B.    Issue an order enjoining the Corps from continuing to operate in accordance with the IOP;

C.    Grant the State of Georgia appropriate interim injunctive relief to protect Georgia from irreparable harm pending the outcome of this litigation;

D.    Issue an order enjoining the Corps to complete the process of updating the Water Control Manual for the ACF Reservoirs within three years;

E.    Award the State of Georgia attorneys fees and costs; and

F.    Award such other further relief as the Court may deem just and proper to protect the interests of Plaintiff and the citizens of Georgia.

Respectfully submitted this 15th day of October, 2008.

THURBERT E. BAKER
GA Bar No. 033887
Attorney General

ROBERT S. BOMAR
GA Bar No. 066400
Deputy Attorney General

ISAAC BYRD
GA Bar No. 101150
Deputy Attorney General

 /s/ John C. Allen
Bruce P. Brown
Georgia Bar No. 064460
R. Todd Silliman
Georgia Bar No. 646005
John C. Allen
Georgia Bar No. 159073
McKenna Long & Aldridge, LLP
303 Peachtree Street, N.E.,
Suite 5300
Atlanta, Georgia 30308
(404) 527-4000
(404) 527-4198 (Fax)

ATTORNEYS FOR THE STATE OF
GEORGIA

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 15th day of October 2008, a true and correct copy of the foregoing SECOND AMENDED AND SUPPLEMENTED COMPLAINT IN *GEORGIA V. UNITED STATES ARMY CORPS OF ENGINEERS,* CIVIL ACTION FILE NO. 3:07-CV-251 was filed with the Clerk of the Court using the CM/ECF system.


_____/s/ John C. Allen_____
Counsel for the State of Georgia